**OMEGA SATELLITE PRODUCTS CO., Plaintiff,**

v.

**CITY OF INDIANAPOLIS, Defendant.**

No. IP 82–339–C.

United States District Court,
S. D. Indiana,
Indianapolis Division.

March 26, 1982.

Edward W. Harris, III, Sommer & Bernard, Indianapolis, Ind., for plaintiff.

Harry T. Ice, G. Daniel Kelly, Jr., Ice, Miller, Donadio & Ryan, John R. Ryan, Corp., Counsel, Legal Division, Indianapolis, Ind., for defendant.

## OPINION

HOLDER, District Judge.

The plaintiff, Omega Satellite Products Co., commenced this action against the defendant, City of Indianapolis, with the filing of its five count complaint on March 11, 1982, seeking injunctive relief and damages. The plaintiff demanded a trial by jury. Filed contemporaneously with the plaintiff's complaint was a motion for temporary restraining order and preliminary injunction. Pursuant to Rules 65 and 78 of the Federal Rules of Civil Procedure, the Court on March 12, 1982 ordered that the trial of this action on the merits be advanced and consolidated with the hearing on the application for temporary restraining order and for preliminary injunction. The Court further ordered that the trial of this action on the merits be scheduled for Wednesday, March 17, 1982, and that the defendant file its answer to the plaintiff's complaint on or before March 17, 1982. An amended five count complaint was filed on March 12, 1982 in which preliminary and permanent injunctions were requested in counts I, II and III.

The plaintiff filed a motion for preliminary injunction as to count V of its amended complaint on March 15, 1982 as well as a motion to sever the trial on the merits of counts IV and V of the first amended complaint from the trial on the merits on counts I, II and III and the hearing on plaintiff's request for preliminary injunction on count V. The defendant filed a motion for continuance of the trial on the merits and hearing on the preliminary injunction on March 16, 1982 to which the plaintiff objected.

The action thus came before the Court on March 17, 1982, whereupon the Court granted in part the defendant's motion for a continuance and continued all matters except the motion for a temporary restraining order and preliminary injunction. The Court ordered that the defendant file its answer to the amended complaint within the usual time period provided in the Federal Rules of Civil Procedure. Accordingly, an evidentiary hearing was commenced in this action on March 17, 1982 and concluded on March 19, 1982 on the plaintiff's motion for a temporary restraining order and preliminary injunction as to counts I, II, III and V of the plaintiff's amended complaint. At the conclusion of the hearing, the Court ordered the parties to submit proposed findings of fact, conclusions of law and briefs on or before Thursday, March 25, 1982.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

The plaintiff, Omega Satellite Products Co., is a limited partnership engaged in the cable television business in Indianapolis, Indiana. The plaintiff's principal place of business is in Indianapolis, Indiana.

The defendant, City of Indianapolis, is a consolidated first-class city organized under the laws of the State of Indiana.

The plaintiff, Omega Satellite Products Co., offers to deliver by co-axial cable to consumers a package of television programming of its own design for a monthly subscription fee. Omega Satellite Products Co. operates various "earth stations" or dishes which are able to receive broadcast signals from satellites. A cable system is then used to transmit these broadcast signals to the individual television sets of plaintiff's subscribers. Omega Satellite Products Co. selects the television programming it offers as a part of its subscription package from programming transmitted by independent local television stations, local television network affiliates, and from programming broadcast from any of several satellites. As part of its subscription package, Omega Satellite Products Co. offers a twenty-four hour all news channel, a movie channel, a sports channel offering special sporting events, satellite programs such as WGN (Channel 9) out of Chicago, Illinois, and WTBS (Channel 17) out of Atlanta, Georgia, as well as local Indianapolis area channels. Omega Satellite Products Co. also has one channel on which it generates its own limited programming.

The plaintiff first offered its services in the Indianapolis, Indiana, geographical area in 1980. The plaintiff focused its efforts on serving the residents of various apartment complexes by entering into individual lease agreements with the managing agents of these apartment complexes. In servicing the residents of these apartment complexes, the plaintiff can set up its receiving and delivery systems without using or crossing under or over the public ways of the City of Indianapolis.

The Court would note at this point that on May 19, 1967 the City of Indianapolis [1] entered into a non-exclusive franchise agreement with Metropolitan Cablevision Corporation for a period of twenty-five years for a community antenna system to serve the people of Marion County, Indiana. Since the City of Indianapolis entered into this franchise agreement on 1967, markedly improved technology has become available in the broadcast and television industry allowing additional entrepreneurs to enter into the marketplace. Accordingly, the plaintiff herein is one of several business entities in the Indianapolis, Indiana, area offering to paid subscribers otherwise unavailable television programming via a system of geo-stationary satellites and co-axial cable.

On November 19, 1979 the City-County Council of Indianapolis, Marion County, Indiana, passed General Ordinance No. 125,-1979, which was approved by the Mayor on November 22, 1979, a copy of which is attached and incorporated herein by reference as Exhibit A. This General Ordinance amended the Code of Indianapolis and Marion County by adding a new Chapter 8½ regulating the granting of cable television franchises and regulating the construction, maintenance, and operation of cable television systems. On July 6, 1981 the City-County Council of Indianapolis, Marion County, Indiana, passed General Ordinance No. 60,1981, amending Chapter 8½ of the Code of Indianapolis and Marion County, this General Ordinance was subsequently approved by the Mayor on July 13, 1981, a true and correct copy of which is attached and incorporated herein by reference as Exhibit B.

Chapter 8½ of the Code of Indianapolis and Marion County established a system for non-exclusive cable television franchises for

---

1. The non-exclusive franchise was entered into by the then existing unit of Government of Marion County, Indiana, which has been succeeded to by the City of Indianapolis, Indiana, I.C. § 36–3–1–1 et seq.

cable television systems which used the public ways. With the enactment of Chapter 8½ in November of 1979, applications were accepted for the awarding of non-exclusive cable television franchises in the Indianapolis, Indiana, area. At least four cable companies submitted applications. Public hearings were held and a non-exclusive franchise contract with the City of Indianapolis, Indiana, and American Cablevision of Indianapolis, Inc. was adopted by the City-County Council on February 9, 1981; approved by the Mayor on February 16, 1981; and executed on February 19, 1981. Under this non-exclusive franchise contract, a cable television franchise was awarded to American Cablevision of Indianapolis, Inc. for the geographic area within the "old City Limits" and the "included Towns" as defined in I.C. § 18–4–1–1 *et seq.*, recodified in I.C. § 36–3–1–1, *et seq.*

American Cablevision of Indianapolis, Inc. began laying cable within its franchised area in the fall of 1981. American Cablevision of Indianapolis, Inc. plans to complete laying cable within its area by the year 1984.

Indianapolis Cablevision Company, Limited is the purported assignee and successor of the May 19, 1967 franchise agreement between Metropolitan Cablevision Corporation and the City of Indianapolis. Indianapolis Cablevision Company, Limited has completed ninety percent of the construction of its cable facilities to service the area outside the old city limits of Indianapolis, Indiana, as defined in I.C. § 18–4–1–1, *et seq.* recodified I.C. § 36–3–1–1, *et seq.* Indianapolis Cablevision Company, Limited plans to complete the construction of its cable facilities in the summer of 1982.

The plaintiff, through its general partners, has considerable knowledge and expertise in the cable television industry. One of the plaintiff's general partners and the major stockholder in an affiliated company, Omega Communications, Inc., has been associated with the cable television business for fourteen years. This same general partner is extensively involved in other cable television operations in thirty to forty communities in Indiana, Illinois, Michigan, Missouri, New Mexico and Pennsylvania. There is no appreciable difference between the manner in which cable television franchises have been awarded in the thirty to forty communities in which the plaintiff's management is involved and the system used by Indianapolis, Marion County, Indiana. The other general partner of the plaintiff is an attorney, licensed to practice law in the State of Indiana.

Despite this legal and cable television expertise, the ownership of the plaintiff chose not to participate in the franchising procedures before the City-County Council. The plaintiff herein, Omega Satellite Products Co., did not at any time submit a written application for a cable television franchise with the City of Indianapolis.

Beginning in March of 1981, Omega Satellite Products Co., through its general partners wrote to various members of the City of Indianapolis' Legal Division and the Department of Public Works. The plaintiff also corresponded with the President of the City-County Council and one councilman requesting that an ordinance be introduced in the City-County Council for the granting of additional cable television franchises. Plaintiff never contacted any of the remaining twenty-seven members of the City-County Council.

The substance of all correspondence was the plaintiff's desire to expand its cable television service in the Indianapolis, Indiana, area. Such expansion of cable television service required reasonable access to the public ways so that cable could be strung or laid over or under the public ways. The discussions and correspondence between the plaintiff and various members of the City of Indianapolis' agencies and councilmen continued up until the filing of this current action. During the course of these discussions, the plaintiff expanded its original plan of seeking permission to cross a single public way from one apartment complex to another, to a desire to compete in the entire Indianapolis, Indiana, geographic area with a cable television system. The response of the defendant, City of Indi-

anapolis, although lacking in absolute clarity, was consistent in that it indicated that to cross or use the public ways for a cable television system the plaintiff would have to comply with the provisions of Chapter 8½ of the Code of Indianapolis and Marion County and apply for a cable television franchise.

The sometimes conflicting advice received by the plaintiff from the City of Indianapolis employees is understandable in light of the fact that Chapter 8½ was a newly enacted ordinance. Further, no application for a cable television franchise had been made since the awarding of the franchise to American Cablevision of Indianapolis, Inc. Accordingly, plaintiff's inquiries were the first opportunity the City of Indianapolis had to interpret Chapter 8½ in a situation where a potential applicant expressed a desire in obtaining a franchise in an area where another franchise had already been granted.

The City of Indianapolis and its employees are under no obligation to render free legal advice to private applicants. This is especially true in a situation such as this where one of the general partners of the plaintiff is a practicing attorney.

In May of 1981 the plaintiff laid a co-axial cable through a City of Indianapolis drainage culvert and under 38th Street in approximately the 7000 block West in Marion County, Indiana. The plaintiff laid this co-axial cable without the knowledge or consent of the City of Indianapolis and in violation of the Code of Indianapolis and Marion County. The co-axial cable under 38th Street in Indianapolis, Indiana, serves approximately 680 of plaintiff's subscribers with cable television programming, linking its operators on the South and North sides of 38th Street. The plaintiff never notified the City of Indianapolis of the existence of this co-axial cable. The City of Indianapolis learned of the presence of this cable during an inspection of the street right-of-way. On January 11, 1982 and again on February 26, 1982 the City of Indianapolis requested the plaintiff to remove the 38th Street cable and any other cables which

cross the public ways. Simultaneously, the plaintiff was reminded of its right to apply for a cable television franchise under Chapter 8½.

On February 8, 1982 representatives of the plaintiff met with a member of the legal division of the City of Indianapolis. Pursuant to this meeting and at the advice of the member of the City legal division, the plaintiff contacted the Director of Telecommunications of the City of Indianapolis and requested that the Cable Franchise Board, created under Chapter 8½-138 of the Code of Indianapolis and Marion County, convene and consider a presentation by the plaintiff on its efforts to obtain permission from the City of Indianapolis to use or cross public ways, specifically at the 38th Street location. The Cable Franchise Board is scheduled to meet on April 6, 1982 and has scheduled a presentation by the plaintiff on its agenda.

The Cable Franchise Board was first created in July 1981 when Chapter 8½ of the Code of Indianapolis and Marion County was amended. Members of the Cable Franchise Board were first duly approved and qualified as of March 1, 1982. An informal meeting of the Cable Franchise Board, with all members present, was held on March 2, 1982. The next meeting of the Cable Franchise Board will be April 6, 1982.

On March 11, 1982, the plaintiff filed its application with the Department of Transportation of the City of Indianapolis to cross the public way at 38th Street in approximately the 7000 block West. The plaintiff filed its application with the Department of Transportation on the same date that it initiated the present action and approximately eleven months after the plaintiff laid its co-axial cable at the 38th Street location through a drainage culvert. Other than the plaintiff's March 11, 1982 application, no unfranchised cable television operator has ever applied to the Department of Transportation to run a co-axial cable under or over a public way. The plaintiff's March 11, 1982 application for the 38th Street location is pending before the Department of Transportation and no

final action thereon has been taken by the Department of Transportation. Denial of a permit by the Department of Transportation is appealable to the Transportation Board. The Department of Transportation has no policy regarding the use of public ways by unfranchised cable television operators other than that any party requesting a permit must comply with the statutes of the State of Indiana and the Code of Indianapolis and Marion County.

For the purposes of this preliminary injunction and temporary restraining order, the defendant, City of Indianapolis, has stipulated that it will do nothing to interfere, obstruct or remove the plaintiff's coaxial cable under 38th Street in the 7000 block West in Indianapolis, Marion County, Indiana, until there has been a full trial on the merits of this action.

The chief issue in this case is the application of Chapter 8½ of the Code of Indianapolis and Marion County, as amended, to the plaintiff. As the plaintiff stated the issue and its position at the commencement of this hearing, "(w)e are asking only the City not to enforce this one unconstitutional ordinance." *See:* Vol. 1 of Official Reporter's Transcript of Proceeding at Hearing, March 17, 1982, at p. 28.

Within the Indianapolis, Marion County, Indiana, geographical area there are two distinct groups of cable television operations. These are franchised and non-franchised cable television companies. The franchise requirements of Chapter 8½ of the Code of Indianapolis and Marion County apply only to cable television systems which use the public ways of the City of Indianapolis. The franchise requirements of Chapter 8½ of the Code of Indianapolis and Marion County do not apply to a cable television system which does not require the use of the public ways. Accordingly, Omega Satellite Products Co. can operate in the City of Indianapolis without a franchise and without violating Chapter 8½ of the Code of Indianapolis and Marion County so long as it does not use or cross under or over a public way.

The plaintiff first offered its services in the Indianapolis, Indiana, area in 1980. Until May of 1981 the plaintiff offered its cable television services without crossing or using a public way of the City of Indianapolis. It was and is presently technologically possible for the plaintiff, Omega Satellite Products Co., to offer its cable television services without crossing or using a public way. The plaintiff receives its satellite and other transmissions by the use of "earth stations", more commonly described as dishes, which are approximately twelve feet in diameter. The dish is aimed at a stationary satellite; receives the satellite signals which are then reflected into a low noise amplifier. These signals are then processed through receivers and modulators and then distributed through the use of a co-axial cable to individual television sets and households. By the use of this procedure, it is not necessary to cross or use a public way. Further, it is technologically possible for a subscriber to contract with two different cable television companies at the same time and for these subscribers to receive the programs of both cable television companies through the same co-axial cable.

The average cost of an "earth station" or dish for use in a residential area ranges from three to seven thousand dollars. An "earth station" or dish for an apartment complex area ranges from twenty-five to thirty thousand dollars. In some geographical locations it is more cost efficient to use a fewer number of stations and more co-axial cable, including putting co-axial cable under or over the public ways. It is only when a co-axial cable is placed so that it requires the use of the public ways that the franchise requirements of Chapter 8½ of the Code of Indianapolis and Marion County are applicable.

Chapter 8½ of the Code of Indianapolis and Marion County was adopted pursuant to I.C. § 18–1–21–5 and § 18–1–21–6, presently found in an appendix to Title 8, Burns Edition, and re-codified at I.C. § 36–9–6–13. In enacting Chapter 8½, the City-County Council determined that because the operation of a cable television system required the permission of the City of Indianapolis to

use the public ways, it was proper and expedient to franchise such systems. The franchising of cable television systems because they cross the public ways is not a particularly new or novel idea to the City of Indianapolis. In 1965 the State Attorney General for the State of Indiana expressed the opinion that Indiana municipalities could grant a franchise to community antenna television system companies as long as such franchises and contracts were not exclusive. *See: Opinions of the Attorney General of the State of Indiana, Official Opinion No. 75* p. 390 at 413–414, December 31, 1965. Additionally, the Federal Communications Commission has written that "(L)ocal governments are inescapably involved in the (franchising) process because cable makes use of streets and ways and because local authorities are able to bring a special expertness to such matters * * *." 37 Federal Register 3276 (1972); *Community Communications Company, Inc. v. City of Boulder, Colorado*, 660 F.2d 1370 (10th Cir. 1981) at Ftn. 8, p. 1378. To this end, the Federal Communication Commission has promulgated 47 C.F.R. § 76.30 and § 76.31 (revised as of October 1, 1980), a copy of which is attached and incorporated herein as Exhibit C, as recommended procedures for adoption as part of the local franchising process. An examination of Chapter 8½ of the Code of Indianapolis and Marion County indicates that it is fashioned after and incorporates the recommendations found in 47 C.F.R. § 76.31 (revised as of October 1, 1980) and the accompanying Note.

Under Chapter 8½ of the Code of Indianapolis and Marion County a cable television franchise is only required when a cable television system requires the use of the public ways. The plaintiff readily admits that when a co-axial cable is laid under a public way there is a danger of hitting or disrupting other utilities, such as a gas main or a telephone line. The City-County Council has enacted Chapter 8½ of the Code of Indianapolis and Marion County to insure, in part, the proper use and maintenance of its public ways.

The Court finds that under Chapter 8½ of the Code of Indianapolis and Marion County anyone can file a cable television franchise application with the Clerk of the City-County Council. The Court further finds that under Chapter 8½, as amended, the Cable Communications Office is responsible for the administrative supervision of franchisee's compliance and of franchisee's contractual obligations. Additionally, the Cable Communications Office provides the administration and staff support for the Cable Franchise Board. The Cable Franchise Board has the power and duty to execute franchise contracts as well as to enforce the provisions of all franchises for any area of the City of Indianapolis. Specifically, the Cable Franchise Board is authorized to approve one or more non-exclusive franchising contracts conveying the right to construct, operate and maintain within the public ways in the City, poles, cables, and any other equipment necessary to the operation of a cable television system.

Additionally, Section 8½–129 of Chapter 8½ provides in part that:

(a) Whenever the administrator of the Cable Communications Office or the Cable Franchise Board determines that an issue raised with respect to cable communications is beyond the authority of the (Cable Communications) Office or (Cable Franchise) Board or raises questions of public policy such issues may be referred to a committee of the council. With the consent of the President of the Council, such issues will be referred either to the Administration Committee or the Community Affairs Committee * * *.

(b) The following issues *will* be referred to the Administration Committee:

* * * * * *

(3) Specific *applications for* the *granting* or renewal of *a franchise; * * *.* (emphasis added).

Thus, under Chapter 8½, as amended, the plaintiff could submit a cable television franchise application to either the Cable Communications Office or the Cable Franchise Board and such would be referred to

the Administration Committee of the City-County Council for action.

The Court finds that the plaintiff has not submitted a cable television franchise application to either the Cable Communications Office, the Cable Franchise Board or the Clerk of the City County Council, as required under Chapter 8½ of the Code of Indianapolis and Marion County.

The Court further finds that the franchises granted to Metropolitan Cablevision Corporation, as assigned to Indianapolis Cablevision Company, Limited and American Cablevision of Indianapolis, Inc., are non-exclusive franchises. The Court finds that under Chapter 8½ of the Code of Indianapolis and Marion County additional non-exclusive franchises may be granted for areas of the City of Indianapolis which are already included within the franchise area of a previously awarded franchise.

From the record established in this evidentiary hearing there is no evidence of any agreement, express or implied, regarding any restraint on trade or competition between the City of Indianapolis and any cable television service, including American Cablevision of Indianapolis, Inc., Indianapolis Cablevision Company, Limited, or Metropolitan Cablevision Corporation.

The Court further finds that the plaintiff, Omega Satellite Products Co., can continue its service through a system of "earth stations" i.e. dishes, and co-axial cables without crossing the public ways and without the necessity of obtaining a franchise under Chapter 8½ of the Code of Indianapolis and Marion County.

The Court takes judicial notice of the voluminous number of East-West and North-South Streets, city blocks and intersections, within the City of Indianapolis, Marion County, Indiana. Attached hereto and incorporated herein by reference as Exhibit D * is a map of the City of Indianapolis showing the location of such streets.

An examination of the attached map of the City of Indianapolis, shows that there are approximately 260 square miles in the City of Indianapolis, Marion County, Indiana. There are approximately 5,000 named or numbered streets within this geographic area. To illustrate the voluminous street crossings which would be required to place co-axial cable for proper service, if a cable television company crossed each street twice, a single cable television company would have to make crossings of the public ways in excess of 10,000 times. Assuming that there are eight streets on each side of a square mile, there would be approximately 64 blocks per square mile; assuming further that two-thirds of the City of Indianapolis, Marion County, Indiana, is so populated that there would be 64 blocks per square mile × 172, there would be 11,138 city blocks within the City of Indianapolis, Marion County, Indiana, all of which would be susceptible to being crossed by a cable television company.

Chapter 8½ of the Code of Indianapolis and Marion County is potentially applicable to all cable television operators which use the public ways, not just the plaintiff herein. The Court finds that without a local system of cable television franchising, as embodied in Chapter 8½, the public ways of the City of Indianapolis could and would be used and/or crossed both under and over, at numerous locations causing potentially disruptive utility service, traffic congestion and safety hazards to the City of Indianapolis, Marion County, Indiana, a city of approximately one million residents.

The plaintiff has disputed the constitutionality of various individual sections of Chapter 8½; for example, those sections dealing with bidding and application fees. Chapter 8½–122 provides that if any portion of Chapter 8½ is declared to be invalid, the remaining provisions shall not be affected. In this proceeding for a temporary restraining order and preliminary injunction the record is sparse and incomplete as to the need or purpose of such fees as well as some of the more unique features of cable television and the diverse interests involved in its regulation. All of these mat-

* Exhibit D is attached to the original entry only.

ters can only be properly considered after a trial on the merits and the full development of a factual record.

Any of the foregoing findings of fact that may be deemed or construed as a conclusion of law is hereby adopted as a conclusion of law.

The Court has jurisdiction of the parties and subject matter of this action under 28 U.S.C. § 1331 and § 1337 and 15 U.S.C. § 15 and § 26. Venue in the Southern District of Indiana, Indianapolis Division, is proper under 28 U.S.C. § 1391(b).

Cable television programming is speech, and the dissemination of television programming by cable is an activity protected under the First Amendment, applicable to the defendant, City of Indianapolis, under the Fourteenth Amendment. However, the nature and degree of protection afforded to First Amendment expression in any particular medium depends on the medium's individual characteristics.

When a cable television operator uses the public ways to lay his co-axial cable and deliver his message, disruption to the streets, alleys and other public ways of the defendant necessarily occurs. Accordingly, some form of local government permission must precede such potentially disruptive use of the public way. To this end the City-County Council adopted Chapter 8½ of the Code of Indianapolis and Marion County.

The City of Indianapolis' system of cable television regulation, embodied in Chapter 8½ of the Code of Indianapolis and Marion County, as amended, does not on its face violate the plaintiff's First Amendment rights under the United States Constitution in that it does not have as its purpose the regulation of programming content.

Chapter 8½ of the Code of Indianapolis and Marion County was adopted by the City-County Council pursuant to the Legislative grant of authority found in I.C. § 18–1–21–5 and § 18–1–21–6, presently found in the appendix to Title 8, Burns Edition, and re-codified at I.C. § 36–9–6–13.

The City-County Council's determination that market forces cannot properly guide the development of the cable television industry is not necessarily inconsistent with the Congressional purposes which underlie the anti-trust laws nor is it necessarily preempted by the Federal anti-trust laws. Further, it has been held that the Sherman Anti-Trust Act does not prohibit two or more persons from associating together in an attempt to persuade a Legislative body or executive to take particular action with respect to a law that would produce a restraint or a monopoly. It is not illegal for people to seek action on particular laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors. *Eastern Railroad Presidents Conference, et al. v. Noerr Motor Freight, Inc., et al.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

The defendant, City of Indianapolis, has stipulated that it will not interfere with, obstruct or remove the plaintiff's co-axial cable under 38th Street in the 7000 block West in Indianapolis, Marion County, Indiana, until there has been a full trial on the merits.

The plaintiff has not shown for the purposes of this temporary restraining order and preliminary injunction that it has no adequate remedy at law or that it will suffer immediate and irreparable injury, loss or damage. Nor has the plaintiff shown that it has at least a reasonable likelihood of success on the merits. The plaintiff has not demonstrated where the threatened injury to the plaintiff outweighs the threatened harm any preliminary injunction may have on the defendant, City of Indianapolis. The plaintiff has not shown that the granting of a preliminary injunction will not disserve the public interest.

The equities are against the plaintiff and in favor of the defendant, City of Indianapolis.

The plaintiff's first amended complaint raises numerous constitutional issues and

alleged statutory violations. The resolution of these issues will require substantial factual proof and the exploration of complex legal issues. These complex legal and factual issues should not be lightly regarded, nor can they be properly determined until a full factual record has been developed. Accordingly, it would be inappropriate for the Court to grant a temporary restraining order and preliminary injunction on the basis of the present record.

The plaintiff has not maintained its burden of proof.

The law is with the defendant and against the plaintiff.

Any of the foregoing conclusions of law that may be deemed or construed as a finding of fact is hereby adopted as a finding of fact.

### JUDGMENT

It is ADJUDGED that the plaintiff, Omega Satellite Products Co., recover nothing from the defendant, City of Indianapolis, by its motion for temporary restraining order and preliminary injunction.

It is further ORDERED that the trial of this action on the merits be and is scheduled for September 7, 1982 and that the parties are ORDERED to complete discovery and all other matters to ready this action for trial on this date.

STATE OF INDIANA    )
                    )  SS:
COUNTY OF MARION    )

I, Karen E. Hufty, Deputy Clerk of the City-County Council of Indianapolis, Marion County, Indiana, do hereby certify that the attached is a true, full and complete copy of General Ordinance No. 125, 1979, which was passed by the Council on November 19, 1979 and approved by the Mayor, on November 22, 1979; and General Ordinance No. 60, 1981, As Amended, which was passed by the Council on July 6, 1981 and approved by the Mayor on July 13, 1981.

/s/ Karen E. Hufty
Karen E. Hufty
Deputy Clerk of the
City-County Council

WITNESS MY HAND THIS 16th DAY OF March, 1982.

[SEAL]

### EXHIBIT A

### PROPOSAL NO. 263, 1979

### CITY–COUNTY GENERAL ORDINANCE NO. 125, 1979

A GENERAL ORDINANCE amending the Code of Indianapolis and Marion County, by adding a new Chapter 8½ regulating the grant of cable television franchises, and regulating the construction, maintenance, and operation of cable television systems.

BE IT ORDAINED BY THE CITY–COUNTY COUNCIL OF THE CITY OF INDIANAPOLIS AND OF MARION COUNTY, INDIANA:

SECTION 1. The Code of Indianapolis and Marion County is hereby amended by adding a new Chapter 8½ to read as follows:

### CHAPTER 8½: CABLE TELEVISION

#### Article I: General

Sec. 8½–1. Statutory Authority

Because the operation of a cable television system requires the permission of the City to use the public ways, the Council determines that it is proper and expedient to franchise such systems pursuant to IC 18–1–21–5 and IC 18–1–21–6.

The Council hereby finds that it is in the interest of the City that the public ways be used to make cable television available to the people of the City, but that the regulation of cable television operators is necessary due to the deficiency of market place forces in providing immediate, reliable, and efficient service at affordable rates. It is intended that the provisions of this chapter should facilitate and encourage orderly and responsible development of a system which will provide the people of the City with cable television service which is versatile, reliable, and efficient and which is available at affordable rates. The provisions of this

chapter shall be construed liberally to further this purpose.

Sec. 8½–2.  Definitions.

As used in this Chapter:

(a) "Applicant" means any person who files an application with the Clerk under the terms of Sec. 8½–23 of this chapter.

(b) "Board" means the Board of Public Works of the City.

(c) "Cable television system" or "system" shall mean any system which receives and amplifies signals broadcast by one or more television and/or radio station and which transmits programming originated by the system itself or by another party, and distributes such signals and programming by wire, cable, microwave, satellite or other means to persons who subscribe to such service; provided, that "cable television system" or "system" does not include any similar system not requiring the use of public ways.

(d) "Committee" means the Cable Television Committee of the City-County Council or any other committee given authority by the Council to perform those duties pursuant to this chapter.

(e) "Franchise" means the non-exclusive rights to construct, operate, and maintain a cable television system.

(f) "Operator" means a person granted a franchise by the City or by any predecessor, governmental officer, or organization authorized to grant such a franchise.

(g) "Person" means and includes any natural person, partnership, corporation, association, or any other organization of natural persons.

(h) "Public way" means the surface and the area above and below the surface of any public street, highway, lane, alley, sidewalk, path, right-of-way or easements and any public utility easements or right-of-ways dedicated generally for public utility uses.

(i) "Subscriber" means any person who contracts or agrees to purchase the regular subscriber service, pay television, or any other service provided by the cable television system, and includes anyone actually using such services.

(j) "Gross accrued revenues" means any and all compensation, in whatever form, exchange or otherwise, directly or indirectly received by the grantee, not including any taxes on services furnished by the grantee imposed directly on any subscriber or user by a city, county, state or other governmental unit, and collected by the grantee for such entity.

(k) "Clerk of the Council" or "Clerk" means Clerk of the City-County Council.

(l) "City" means the Consolidated City of Indianapolis, Marion County, Indiana, a municipal corporation of the State of Indiana, created by the Consolidated First-Class Cities and Counties Act (IC 18–4–1–1 et seq.).

(m) "Old City Limits" means that area of the City coterminous with the boundaries of the First-Class City of Indianapolis as the same existed on December 31, 1969, the day preceding the effective date of the Consolidated First-Class Cities and Counties Act.  (IC 18–4–1–1 et seq.).

Sec. 8½–3.  Administration and Enforcement.

The Board shall have the power and duty to:

(a) Execute franchising contracts under the terms and procedures provided in this chapter; and in the event that more than one franchise is granted within the city, to ensure that all systems are compatible.

(b) Promulgate any and all rules and regulations which it deems necessary to enable it to carry out its duties under this chapter; provided that, if within sixty (60) days after delivery of certification to the Clerk of the adoption of rules and regulations by the Board, the City-County Council shall by Council action disapprove or reject such rules and regulations, the adopted rules and regulations of the Board shall be of no effect and the rules and regulations shall remain as they were in effect prior to disapproval or rejection by the Council.  If the Council does not act within the sixty (60) days after delivery of certification, the adopted rules and regulations by the Board shall become effective.

(c) Enforce the provisions of all franchises for any area of the City.

Sec. 8½–4.  Previously Awarded Franchises.

Articles III, IV, V, VI, and VII of this chapter shall apply to all cable television systems whether such franchise was granted before or after the effective date of this chapter including the non-exclusive franchise entered into on May 9, 1967, by the County Commissioner of Marion County, Indiana, and Metropolitan Cablevision Corporation.

Should any operator, asserting cable television franchise rights within the City by reason of agreement entered into other than pursuant to this chapter, request amendment of such agreement, any amendment approved by or on behalf of the Council shall expressly require such amended franchise to be subject to this chapter.

In the event of conflicts between this chapter and the provisions of any cable television franchise granted prior to the effective date of this chapter, each provision of this chapter shall control unless that interpretation is judicially determined to be an unconstitutional impairment of the contract rights of the holder.

### Article II:  Board Authority and Application Procedures

#### Division 1.  Authority

Sec. 8½–11.  Authority to Approve Franchising Contracts.

Subject to the provisions of this article, the Board is hereby authorized to approve one or more non-exclusive franchising contracts conveying the right to construct, operate, and maintain, within the public ways in the City, poles, cables, and any other equipment necessary to the operation of a cable television system.

#### Division 2.  Procedural Step

Sec. 8½–21.  Initial Resolution.

Applications will not be accepted except following action by the Council determining that a franchise should be granted for all or a portion of the City.

Sec. 8½–22.  Notice of Determination.

Within thirty (30) days after the determination that a franchise should be granted, the Clerk of the Council shall give notice of the determination by:

(a) Posting of that notice in three public places;

(b) Publication of that notice once each week for two (2) weeks in two newspapers of general circulation in the City; and

(c) Mailing of that notice to any person the Clerk knows to be interested in submitting an application, and publication in at least one newspaper of national circulation and in trade magazines or publications of the Cable Television industry.

Sec. 8½–23.  Submission of Applications.

Within ninety (90) days after the posting or the first publication provided for in Sec. 8½–22, whichever occurs last, all interested persons shall file with the Clerk of the Council fifteen (15) copies of their application containing the terms of an offered franchising contract, all information necessary to evaluate each applicant and to compare each applicant with other applicants, and the proper requests for pole usage agreements with any utility.  The application shall be in the form and contain the information required by the General Counsel of the City-County Council, and shall include a non-refundable bidding application fee of three thousand dollars ($3,000), payable to the City of Indianapolis.

Sec. 8½–24.  Applications and Public Documents.

All applications shall become public at the end of the ninety (90) day period in Sec. 8½–23, and the Clerk shall then make copies of the application available for immediate inspection by any person.  The Clerk shall place in three (3) public libraries copies of the applications.  Anyone may purchase copies of all or parts of any application upon payment of a charge of fifteen cents ($.15) per page.

Sec. 8½–25.  Public Hearings.

Within the thirty (30) days after the expiration of the period for filing applications,

the Cable Television Committee of the Council shall conduct at least two hearings at which any person may comment on the various applications before the Committee. The Clerk shall publish notice in two newspapers of general circulation in the City seven days prior to each hearing. Any person wishing to comment at the hearing must file with the Clerk at least twenty-four (24) hours before the hearing, notice of their intent to comment.

Sec. 8½–26. Final Action by the Board.

Within one hundred and twenty (120) days after the final date for filing applications, the Cable Television Committee shall submit the applications with proper evaluation to the Board. The Board shall have forty-five (45) days from receipt of the Committee's evaluation to determine in a single resolution which applications to accept or reject.

Such resolution of the Board shall specify the reasons for rejection of any application and shall set forth the language of any recommended franchising contract and the Council ordinance approving and confirming such contract. A copy of such resolution shall be immediately sent to all applicants. If the language of the franchising contract varies from that proposed by the applicant, such acceptance shall be conditional upon the applicant agreeing to the recommended contract by written agreement filed with the Board no later than fifteen (15) days after the Board's action. If such agreement is not filed, the application shall be deemed rejected without further action of the Board.

Sec. 8½–27. Council Review of Rejections.

Any person, whose application is rejected by the Board, may within ten (10) days of such action petition the Council for review of that decision by filing notice thereof and a copy of the resolution of the Board with the Clerk of the Council. If the Council determines that the rejection is improper under this ordinance, it may by resolution direct the Board to reconsider its action. On reconsideration the Board shall make a further final decision pursuant to Sec. 8½–26.

Sec. 8½–28. Council Action on Recommended Contracts.

Within thirty (30) days of the Board's resolution recommending a franchising contract, the Council shall introduce the ordinance approving and confirming the contract as accepted in the Board's resolution. The Council may:

(a) adopt the ordinance, subject to the veto of the Mayor, in which case the Director of the Department of Public Works will be directed to execute the franchising contract. Ten (10) days after the Mayor consents to the ordinance, the franchising contract holder shall pay an award fee by certified check in the amount of twenty-five thousand dollars ($25,000), payable to the City, or

(b) defeat the ordinance, in which case the application shall be denied, or

(c) by resolution direct the Board to consider certain modifications or amendments to the franchising contract, in which case the Board shall reconsider the application pursuant to Sec. 8½–26.

Under no circumstances shall the Council by ordinance approve or confirm any franchising contract unless the precise language has been accepted by the Board prior to the Council's action.

Sec. 8½–41. Contents of Applications.

The Board shall reject any application containing an offered franchising contract which does not contain the following:

(a) A description of the area of the requested franchise. Provided, that during the hearing process the Cable Television Committee may consider modifications to the description of the area of franchise in any bid application. It is the City's intention that the Council and Board award a franchise to cover all areas specified by the Council in initial resolution adopted pursuant to 8½–21; however, areas which are economically unfeasible or technically impractical for delivery may be excluded.

(b) A construction schedule. The following table fixes the minimum percentage of households located in areas of the franchise where the density is forty (40) or

more households per mile which shall have cable television service available within the given number of years from the date of execution of the franchise contract under the following construction schedule.

| Number of Years | Center Township Households |
|---|---|
| 2 | |
| 3 | 20 |
| 4 | 40 |
| 5 | 60 |
| 6 | 90 |

(c) A schedule indicating the initial tap-in and connection charges and the monthly rates to be charged subscribers.

(d) A description of the insurance policies to be acquired in satisfaction of the requirements of this chapter.

(e) A verified statement which discloses all persons, by name and residential address, who have a beneficial interest of five percent (5%) or more in the applicant. Persons affected by this section shall also disclose any buy-sell agreements of their beneficial interest.

(f) A biographical description of those persons disclosed pursuant to subsection (e).

(g) A statement which includes the most recent and five year pro forma income and expense statements, balance sheets and a quarterly analysis of cash flow, including a narrative explanation of these statements with respect to the phasing of investments and the effect which subscriber and other revenues will have.

(h) An agreement that the operator comply with the terms of this chapter and will not assert that any terms of this chapter are unreasonable or arbitrary.

(i) Additional documentation of the manner in which the applicant proposes to carry out any other of its various duties under this chapter.

Sec. 8½–42. Criteria in Evaluating Applications.

(a) The Board may recommend a franchising contract with the applicant whose application represents the most desirable of all applications submitted for each area of the City.

(b) In determining which application represents the most desirable application, the Cable Television Committee of the Council and the Board shall consider all factors normally considered in any case in which the Committee or Board must make such a determination, including the following:

(1) The financial and technical feasibility of the proposal contained in the application;

(2) The technical ability of the applicant;

(3) The financial ability of the applicant to construct and operate the system;

(4) The confirmation of the applicant's reputable business practices and his community knowledge and responsibility;

(5) The speed of construction of which the applicant is capable;

(6) The quality of the service which the applicant promises and of which the applicant is capable; and

(7) Any special factors ensuring that the applicant will carry out the purposes of this chapter and that the award of the franchise to the applicant is in the best interest of the City.

### Article III: Construction and Maintenance of the System

Sec. 8½–51. Street Occupancy.

(a) All poles, cables, and other fixtures placed by the operator within the public ways of the City shall be so located as to cause minimum interference with the proper use of the public ways and adjoining premises.

(b) If the disturbance of any public way is necessary, the operator shall comply with all provisions of the code relevant to such disturbance.

(c) If at any time during the period of the franchise the City shall elect to change the grade of any public way, the operator, upon reasonable notice by the City, shall relocate its poles, cables, and other fixtures at no expense to the City.

(d) The operator shall have the authority to trim trees upon and overhanging the public ways of the City so as to prevent the branches of such trees from coming in contact with the cables and the equipment of the operator, except that at the option of the City, such trimming may be done by it or under its supervision and direction.

(e) In all sections of the City where the cables, wires, or other like facilities of public utilities are placed underground, the operator shall place its cables and other equipment underground to the maximum extent that existing technology reasonably permits.

Sec. 8½–52. Safety Requirements.

(a) The operator shall at all times employ ordinary care and shall install and maintain in use commonly accepted methods and devices for preventing failures and accidents which are like to cause damage, injury, or nuisance to the public.

(b) The operator shall install and maintain its cables and other equipment in accordance with the requirements of the National Electrical Safety Code promulgated by the National Bureau of Standards.

(c) All cables and other equipment within the public ways of the City shall at all times be kept and maintained in as safe condition as existing technology reasonably permits.

Sec. 8½–53. Erection and Removal of Poles.

No location of any pole or other wire-holding structure of the operator shall be a vested interest and such poles or structures shall be removed or modified by the operator at no expense to the City whenever the Board determines that the public convenience so requires.

Sec. 8½–54. Inspection.

The City shall have the right to make such inspections as it shall find necessary to ensure compliance with the terms of this chapter, the franchising contract, and other pertinent provisions of law.

Sec. 8½–55. Extension of Construction Schedule Deadlines.

Upon a determination that the operator, through no fault of its own, would otherwise be faced with undue hardship in meeting its construction schedule, the Board may modify the construction schedule.

Article IV: Rights and Duties of Operator and Customers.

Sec. 8½–61. Subscribers Rates and Charges.

(a) The rates and charges to subscribers for signals distributed shall be set at the time of the franchise contract and said rates and charges shall be guaranteed and not subject to change or revision for a period of three years from the date of the contract.

(b) The City-County Council hereby reserves the right to review and determine the rates and charges to subscribers for signals distributed by the operator, after the three year period specified in subsection (a).

Sec. 8½–62. Pay Television.

The operator may provide, only as an auxiliary service, programming for which an additional charge is made.

Sec. 8½–63. Public Service Systems.

At least one outlet for the basic regular subscriber service may be made available to all public and accredited private schools which the system passes. Additional service outlets for other public institutions and local government offices may be proposed in any applicant's bid.

Sec. 8½–64. Signal Quality Requirements.

The operator shall:

(a) Transmit signals which will produce pictures and sound at all outlets which are as good as existing technology reasonably permits; and

(b) Transmit signals of adequate strength to produce good pictures with good sound at all outlets without causing cross-modulation in the cables or interfering with other electrical or electronic systems.

Compliance with the regulations of the Federal Communications Commission regarding signals transmitted shall constitute compliance with this section so long as such regulations exist. However, if such FCC Regulations do not exist, the City-County Council hereby reserves the right to provide for regulations to assure that the signals transmitted comply with the best interests of the City and the users of the service.

Sec. 8½–65. Signal Carriage.

(a) The operator shall distribute any signal which existing technology permits.

(b) The operator shall receive and distribute in their entirety the signals of any television stations located in Marion County, including but not limited to: Channel Four—WTTV, Channel Six—WRTV, Channel Eight—WISH, Channel Thirteen—WTHR, Channel Twenty—WFYI, and Channel Forty—WHMB.

Sec. 8½–66. Public and Leased Access Channels.

(a) The operator may make available at least one channel at all times for noncommercial public access, on a nondiscriminatory basis. When construction is completed to forty (40) percent of the households described in Sec. 8½–41(b) of this chapter, the operator may made available sufficient equipment for local production and presentation on that channel of cablecast programs other than automated services. Charges for equipment operation, personnel, and production of this public access programming shall not exceed the pro rata direct cost of such facilities and services.

(b) At least one of twelve (12) VHF channels on which signals can be carried may be available to be leased for any period of time requested by any person wishing to cablecast any program. If at any time there is a demand for a greater number of channels than required under this subsection, all leased access channels shall be leased to the highest bidder. This subsection neither requires the operator to provide nor prohibits the operator from providing equipment to be used in the production and presentation of cablecast programs. The operator may use such leased access channels in its normal operations when not in use by a lessee. The operator may make reasonable regulations with respect to the use of access channels.

(c) The operator shall be responsible for preventing the presentation on the public access channel of (1) of any material designed to promote the sale of commercial products or services and (2) pre-recorded programming which violates the provisions of the Code of Indianapolis and Marion County with respect to obscenity and pornography. The operator shall have authority to control the programs presented over any public or leased access channel and shall have no legal liability for obscenity or pornography except for productions originating from facilities within the control of the operator.

(d) The City-County Council reserves the right to enact an ordinance requiring leased access channel XX availability, if required to insure that the cable television system is operated in the best interest of the public and the subscribers and permissible under law after the first six (6) months.

Sec. 8½–67. Complaint and Service Procedure.

(a) The operator shall maintain an office in the City, which shall be open during all usual business hours, have a listed telephone, and be so operated that complaints and requests for repairs or adjustments may be received at any time, whether the office is open or closed.

(b) Maintenance service shall be immediately available to correct major outages from 8:00 a. m. until 12:30 a. m. every day, including Saturdays, Sundays, and holidays.

(c) Investigative action shall be initiated in response to all service calls, other than major outages, not later than the next business day after the call is received. Corrective action shall be completed as promptly as practicable. Appropriate records shall be made of service calls,

showing when and what corrective action was taken.

(d) The operator shall furnish each subscriber written instructions that clearly set forth procedures for placing a service call or requesting an adjustment. These instructions shall also include a name, address, and telephone number provided by the Board and a reminder that the subscriber can call or write for information regarding terms and conditions of the operator's franchise if the operator fails to respond to the subscriber's request for installation, service or adjustment within a reasonable period of time.

(e) In the event a subscriber does not obtain a satisfactory response or resolution to his request for service or an adjustment within a reasonable period of time, he may advise the Board of his dissatisfaction in writing and the Board shall investigate the matter and keep records with respect to all complaints.

(f) The operator shall interrupt system service after 7:00 a. m. and before 1:00 a. m. only with good cause and for the shortest time possible and, except in emergency situations, only after publishing notice of service interruption at least twenty-four (24) hours in advance. Service may be interrupted between 1:00 a. m. and 7:00 a. m. for routine testing, maintenance, and repair, without notification, on not more than two (2) nights in any week.

Sec. 8½–68.  Termination of Service.

(a) Upon termination of service to any subscriber, the operator shall promptly remove all its facilities and equipment from the premises of such subscriber upon request.

(b) If any subscriber terminates service during the first year of subscription because of the operator's failure to render service to such subscriber in compliance with the provisions of this chapter, or if service to a subscriber is terminated without good cause or because the operator ceases to operate the cable television system for any reason except expiration of the franchise, the operator shall refund to such subscriber an amount equal to the initial tap-in and connection charges paid by the subscriber.

Article V:  Rights and Duties of Operator and City.

Sec. 8½–80.  Franchise Fee.

(a) The operator shall pay annually to the City an amount equal to the three percent (3%) of the gross accrued revenues from cable television operations taken in during the year, and payment of the fee shall be on a quarterly basis. The year to be used in calculating the amount and payment of the franchise fee shall begin on the effective date of the franchise or the anniversary of that date unless the Board approves a different year.

(b) The operator shall be prohibited from pre-paying franchise fees on estimated annual revenues at the time of bidding for a new franchise.

Sec. 8½–81.  Construction Bond.

(a) Within thirty (30) days after the effective date of the franchise, the franchise holder shall obtain and maintain at its cost and expense, and file with the Corporation Counsel, a corporate surety bond issued by a company licensed to do surety business in the State of Indiana and found acceptable by the Corporation Counsel, in an amount of three hundred thousand dollars ($300,000) to guarantee the timely construction and full activation of the cable television system. The bond shall provide, but not be limited to, the following condition: There shall be recoverable by the City, jointly and severally from the principal and surety, any and all damages, loss or costs suffered by the City resulting from the failure of the franchise holder to satisfactorily complete and fully activate the cable television system within seventy-two (72) months of execution of the franchising contract.

(b) Any extension to the prescribed time limit must be authorized by the Council. Such extension shall be authorized only when the Council finds that such extension is necessary and appropriate due to causes beyond the control of the franchise holder.

(c) The construction bond shall be terminated only after the Council finds that the franchise holder has satisfactorily completed and fully activated the cable television system in the franchise area.

(d) The rights reserved to the City with respect to the construction bond are in addition to all other rights of the City, whether reserved by this franchise or authorized by law; and no action, proceeding or exercise of a right with respect to such construction bond shall affect any other right the City may have.

Sec. 8½–82. Security Fund.

(a) Within thirty (30) days after the execution of the franchise contract, the operator shall deposit with the City of Indianapolis, the sum of fifty thousand dollars ($50,000) in monies as security for the faithful performance of all the provisions of the franchise contract, and the payment by the operator of any claims, liens and taxes due the City which arise by reason of the construction, operation or maintenance of the system. Any monies deposited pursuant to this section shall be placed by the Controller in an interest bearing demand account at a bank or local savings institution agreeable to both parties. The interest on this account will accrue to the benefit of the operator upon competition of the requirements in Sec. 8½–41(b), and the security fund will be reduced to an amount of fifteen thousand dollars ($15,000), which amount shall be maintained during the period of the franchise contract.

(b) Within ten (10) days after notice to it that any amount has been withdrawn from the security fund deposited pursuant to subsection (a), the operator shall pay to, or deposit with, the City of Indianapolis a sum of money or securities sufficient to restore such security fund to the full amount required by subsection (a). If the franchise holder fails to pay to the City any compensation within the time fixed herein; or, fails after ten (10) days notice to pay to the City or County any taxes due and unpaid; or, fails to repay to the City, within such ten (10) days, any damages, costs or expenses which the City shall be compelled to pay by reason of any act or default of the operator in connection with the franchise contract or fails, after three (3) days' notice of such failure by the Mayor or his designee to comply with any provision of this chapter, and the Mayor or his designee reasonably determines that such failure can be remedied by an expenditure from the security fund, the Mayor or his designee may immediately withdraw the amount thereof, with interest and any penalties, from the security fund. Upon such withdrawal, the Mayor or his designee shall notify the operator of the amount and date thereof.

(c) The security fund deposited pursuant to this section shall become the property of the City in the event that the franchising contract is cancelled by reason of the default of the operator. The operator, however, shall be entitled to the return of such security fund, or portion thereof, as remains on deposit with the City at the expiration of the term of the franchise contract, provided that there is then no outstanding default on the part of the operator.

(d) The rights reserved to the City with respect to the security fund are in addition to all other rights of the City, whether reserved by this chapter, the franchise or contract or authorized by law; and no action, proceding or exercise of a right with respect to such security fund shall affect any other right the City may have.

Sec. 8½–83. Liability, Indemnification, and Insurance.

(a) The operator shall pay all damages and penalties which the City may legally be required to pay as a result of the grant of a franchise under this chapter, including all damages arising out of the installation, operation, or maintenance of the cable television system, whether or not any act or omission complained of, is authorized, allowed, or prohibited by this chapter or the franchising contract.

(b) The operator shall pay all expenses incurred by the City in defending itself with regard to all damages and penalties

described in subsection (a) of this section. These expenses shall include all out-of-pocket expenses, including attorney's fees.

(c) The operator shall maintain, throughout the term of the franchising contract, a policy or policies of general comprehensive public liability and property damage insurance insuring the City and the operator. Written evidence of payment of premiums and copies of such insurance policy or policies shall be filed with the Board within thirty (30) days of the effective date of the franchise.

Sec. 8½–84. Expansion Outside the Franchise Area.

The grantee may be required to interconnect its system with any other broadband communications facility. Such interconnection shall be made within the time limit established by the City. The interconnection shall, at the City's discretion, be accomplished according to the method and technical standards determined by the City, in a manner consistent with applicable FCC standards.

Sec. 8½–85. City's Use of Poles.

The City shall have the right to install and maintain free of charge upon the poles of the operator any wire and pole fixtures, on the condition that such wire and pole fixtures do not unreasonably interfere with the operator's operation of the cable television system.

Sec. 8½–86. Emergency Use of Facilities.

In the case of any disaster, duly declared by the mayor, the grantee shall, upon request of the mayor, make available to the City for emergency use during the disaster period all facilities not necessary to the grantee in fulfilling its other legal obligations.

Sec. 8½–87. Transfer of Franchise.

(a) In the event the franchise is transferred, in whole or in part, prior consent of the Board to such transfer shall be required.

(b) In the event the operator is a corporation and any person owning or controlling more than five percent (5%) of the opera-

tor's voting stock, through the acquisition of any amount of stock, comes to own or control more than five percent (5%) of the operator's voting stock, prior approval of the Board to such acquisition shall be required.

(c) Any transaction of stock representing a partnership share or any other beneficial interest, having the effect of changing in the aggregate more than fifty percent (50%) of the voting or equity rights, or having the effect of increasing the ownership of any single owner whose prior interest was five percent (5%) or more and his ownership increases by an amount of twenty percent (20%) or more shall be deemed a transfer under this section.

(d) Any prior consent of the Board required by this section shall not be unreasonably withheld, shall be expressed by resolution, and shall be subject to any reasonable conditions prescribed in that resolution and shall be effective only upon approval by the City-County Council.

Article VI: General Regulatory Provisions.

Sec. 8½–101. Compliance with Other Applicable Laws.

(a) The operator shall comply with all statutes, codes, ordinances, rules, and regulations applicable to its business.

(b) A franchise granted pursuant to this chapter authorizes only the operation of a cable television system, and does not take the place of any other franchise, license, or permit which law requires of the operator.

(c) The Council, the Board, and any other agency of the City shall have the power to adopt, in addition to the provisions contained in this Chapter, the franchising contract, and any other applicable ordinances or regulations as of the effective date, such additional ordinances or regulations as they shall find necessary in the exercise of the police power. Provided, that such ordinances or regulations shall be reasonable and not unconstitutionally

in conflict with the rights granted in the franchising contract.

Sec. 8½–102.  New Developments.

It shall be the policy of the City liberally to amend this chapter and franchising contract, upon application of the operator, when necessary to enable the operator to take advantage of any developments in the field of cable television which will afford it an opportunity to better serve its customers.  However, this section shall not be construed to require the City to initiate any amendment.

Sec. 8½–103.  Reports to be Filed with the Board.

(a) The operator shall file with the Board true and accurate maps or plats of all existing and proposed installations.

(b) The operator shall file annually with the Board not later than one hundred twenty (120) days after the end of the operator's fiscal year, a copy of its reports to its stockholders, if any, an income statement applicable to its operations under the franchising contract during the preceding twelve-month period, a balance sheet as of the beginning of the fiscal year, and a statement of its properties devoted to cable television operations, by categories, giving its investment in such properties on the basis of original cost, less applicable depreciation.  These reports shall be prepared or approved by a certified public accountant as being in accordance with generally accepted accounting practices.

(c) The operator shall file with the Board a copy of any formal communications received from or required to be filed with any other governmental agency except tax returns and determinations, including the Federal Communications Commission.

(d) Upon the request of the Board, the operator shall file with the Board written evidence of payment of premiums on insurance policies required by this chapter.

(e) The operator shall keep on file with the Board current copies of insurance policies required by this chapter.

(f) The operator shall keep on file with the Board a current list of its shareholders, partners, bondholders, and all other persons owning any financial interest in the operator.

(g) The operator shall file or keep on file with the Board any information which the Board reasonably deems necessary to ensure that the duties of the operator, its customers, and the Board are carried out.

Sec. 8½–104.  Inspection of Records and Facilities.

The City shall have the right to inspect the operator's books, plans, income tax returns, and other business records, and its studios, equipment, and other facilities at any time during normal business hours.

Article VII.  Termination of the Franchise.

Sec. 8½–111.  Term.

The franchising contract shall take effect and be in force from and after its effective date for a term of fifteen (15) years upon the conditions set forth in this chapter and the franchising contract.  An option for renewal, provided that the Board is given notice not less than one (1) year prior to expiration of the franchising contract, for an additional ten (10) year period under the terms and conditions mutually agreeable to the operator and the Board is presumed to be a valid amendment to the franchising agreement and said option shall be granted by the Board at a public hearing with seven (7) days notice given upon a determination that the operator has substantially complied and can and will continue to comply with the terms of this chapter and the franchising contract;  provided, that the Council, subject to the ordinary veto power of the mayor, may reverse any refusal of the Board to grant a renewal.

Sec. 8½–112.  Penalties and Forfeiture of Franchise.

(a) For certain violations of the provisions of this ordinance, civil penalties shall be chargeable to the security fund as follows:

(1) For failure to complete construction and installation of the system and commencement of providing service in accordance with Sec. 8½–41(b), unless the

Council specifically approves the delay by resolution because of reasons beyond the control of the operator, the operator shall forfeit two hundred dollars ($200) each day or part thereof that the failure continues.

(2) For failure to provide data and reports as requested by the Council or Board or required by this ordinance, the operator shall forfeit fifty dollars ($50) each day or part thereof that the failure continues.

(3) For failure to pay the franchise fee when due pursuant to Sec. 8½–80, the franchise holder shall forfeit two hundred fifty dollars ($250) each day or part thereof that the failure continues.

(4) For persistent failure to comply with such reasonable requests and recommendations as may be made by the Council and Board pursuant to authority granted by this ordinance, the franchise holder shall forfeit fifty dollars ($50) each day or part thereof that the failure continues.

(5) For failure to restore the cash deposit as required in Sec. 8½–82 within the specified ten (10) days, the entire security fund deposit remaining shall be forfeited.

(b) If the civil penalties of subsection (a) are inapplicable or fail to secure compliance, in addition to all other rights and powers retained by the City by virtue of this chapter and the franchising contract or otherwise, the City shall have the right to terminate and cancel the franchise and all rights and privileges of the operator in the event that the operator:

(1) Violates any material provision of this chapter, the franchising contract, or any rule, regulation, order, or determination of the City, the Board, or the Council made pursuant to this chapter, except where such violation is cured within a reasonable time or where such violation, other than of Sec. 8½–87, is without fault or through excusable neglect;

(2) Attempts to evade any of the provisions of this chapter or the franchising contract or practices any fraud or deceit upon the City; or

(3) Fails to meet the construction schedule as established in the franchising contract or as modified by the Board at the end of any two (2) years unless such failure is without fault or through excusable neglect.

(c) Termination and cancellation may be affected only by ordinance of the Council, subject to the ordinary veto power of the Mayor, and shall in no way affect any other of the City's rights under this chapter, the franchising contract, or any provision of law. Any finding of fact, determined by the Council under this section shall be conclusive. However, before the franchise may be terminated and cancelled under this section, the operator must be provided with thirty (30) days notice and an opportunity to be heard before the Council or its designated committee.

Sec. 8½–113. Removal of the System.

Upon expiration or forfeiture of the franchise, as provided for in this chapter, the Council shall have the right to determine whether the operator shall continue to maintain and operate the cable television system pending the decision of the City as to the future maintenance and operation of the system.

Article VIII: Rules of Construction.

Sec. 8½–121. Regulations Issued by Other Governmental Units.

(a) This chapter and any franchise contract executed pursuant to this chapter shall not be construed as incorporating the laws, rules or regulations of any state or federal governmental unit claiming jurisdiction over the regulation of cable television, including the rules of the Federal Communication Commission, whether such laws, rules, or regulations have already been adopted or are adopted in the future.

(b) Should any court of competent jurisdiction at any time declare any provision (section, paragraph, sentence, clause or any other portion) of this chapter unenforceable because of conflict with the

laws, rules, regulations of any state or federal governmental unit, then such unenforceable provision shall be treated as suspended, and shall become effective again immediately upon the repeal of the conflicting law, rule, or regulation and shall be subject to renegotiation.

Sec. 8½–122.   Severability.

Should any provision (section, paragraph, sentence, clause, or any other portion) of this chapter be declared by a court of competent jurisdiction to be invalid for any reason, the remaining provisions shall not be affected, if and only if such remaining provisions, can, without the invalid provision or provisions, be given the effect intended by the Council in adoption of this chapter.  To this end the provisions of this chapter are severable.

SECTION 2.   "Pursuant to Sec. 8½–21 of the Code of Indianapolis and Marion County (as adopted in Section 1 of the Ordinance) the Council hereby determines that a franchise should be granted for all areas of the City which are not included within the area of a previously awarded franchise (as described in Sec. 8½–4 of the Code of Indianapolis and Marion County), and, following such procedures, or at such other time as the Council may deem proper, the Council will determine by resolution whether additional non-exclusive franchises should be granted for those areas of the City which are included within the area of a previously awarded franchise.

SECTION 3.   This ordinance shall be in effect from and after its passage by the Council and compliance with IC 18–4–5–2.

The foregoing was passed by the City-County Council this 19 day of November; 1979.

ATTEST:

[Signature]
_____
President

[Signature]
_____
Clerk of the City-County Council

Presented by me to the Mayor this 21 day of November, 1979.

[Signature]
_____
Clerk of the City-County Council

Approved and signed by me this 22 day of November, 1979.

William H. Hudnut
_____
MAYOR

EXHIBIT B

Proposal No. 264, 1981
Committee Recommendations
As Amended
Rules & Pol. Committee

## CITY–COUNTY GENERAL ORDINANCE NO. 60, 1981

A GENERAL ORDINANCE amending Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", by establishing a Cable Communications Office in the Department of Administration, creating a Cable Franchise Board, and transferring certain functions of the Board of Public Works to the new Office and Board.

BE IT ORDAINED BY THE CITY–COUNTY COUNCIL OF THE CITY OF INDIANAPOLIS AND OF MARION COUNTY, INDIANA:

SECTION 1.   Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", specifically Section 8½–2(b) be, and the same is hereby amended by deleting the words crosshatched and inserting the words underlined to read as follows:

Sec. 8½–2.   Definitions.

(b) Board means the Cable Franchise board of public works of the city, created by Sec. 8½–138 of this chapter.

SECTION 2.   Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", be, and the same is hereby amended by adding a new Article IX to read as follows:

## ARTICLE IX—CABLE COMMUNICATIONS OFFICE.

Sec. 8½–126.   Office Created.

There is hereby created within the office of the Director of the Department of Administration a new office to be known as the "Cable Communications Office".

Sec. 8½–127.   Administrator.

The administrator of the Cable Communications division shall be appointed by and

serve at the pleasure of the Director of the Department of Administration.

Sec. 8½–128. Powers and Functions.

(a) The cable communications office shall be responsible for administrative supervision of franchisee compliance with the provisions of this chapter and of franchisee contractual obligations created by the respective franchise agreements.

(b) The cable communications office shall provide the administration and staff support for the cable franchise board.

(c) The cable communications office shall be responsible for coordinating of all city activities with respect to cable communications.

(d) The cable communications office shall receive and respond to citizens concerns and complaints about cable communications and may refer the same to the Community Affairs Committee or the Cable Franchise Board.

(e) The cable communications office shall advise the government of the City in the formulation and implementation of policy on cable communications and to promote citizen participation in that process by means of public information programs and otherwise; and

(f) The cable communications office may assist in the formulation of policy concerning appropriation of funds for (i) the production of materials for use on access channels, (ii) the construction and maintenance of facilities for such production, and (iii) the education of the public in the use of such facilities; and to make written recommendations to the Council and the Mayor regarding the making of applications for financial assistance and the use of grant funds received pursuant to such application.

Sec. 8½–129. Council Oversight.

(a) Whenever the administrator of the Cable Communications Office or the Cable Franchise Board determines that an issue raised with respect to cable communications is beyond the authority of the Office or Board or raises questions of public policy such issues may be referred to a committee of the Council. With the consent of the President of the Council, such issues will be referred either to the Administration Committee or the Community Affairs Committee as provided in subsection (b) and (c).

(b) The following issues will be referred to the Administration Committee:

(1) Matters affecting the budget, personnel and administrative operation of the Office or the Board;

(2) Revisions of standards and guidelines for CATV franchises and recommended amendments to existing regulations;

(3) Specific applications for the granting or renewal of a franchise;

(4) Applications for approval of subscriber rates and charges or for approval of changes in such rates and charges.

(c) The following issues will be referred to the Community Affairs Committee:

(1) Community or general public concerns with respect to cable communication services within the scope of existing franchises or regulatory ordinances;

(2) Subscriber complaints which the Cable Communications Office is unable to resolve through conciliation or enforcement of existing franchises;

(3) Disputes as to the use of any access channel;

(4) Requests by Councillors for general inquiries into constituent concerns about governmental oversight or activity respecting cable communications.

SECTION 3. Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", be, and the same is hereby amended by adding a new Article X to read as follows:

Article X—Cable Franchise Board

Sec. 8½–138. Cable Franchise Board Created.

There is hereby created a Cable Franchise Board.

Sec. 8½–139. Membership.

The cable franchise board shall consist of three members selected as follows:

(1) The administrator of the cable community office shall be a member of the board and serve as its executive secretary.

(2) Two members shall be appointed by the city-county council to serve at its pleasure, one of who shall be selected by the board as its chairman.

Sec. 8½–140. Powers of Board.

(a) The cable franchise board shall exercise all authority and responsibility as established by Chapter 8½ of this Code.

(b) The cable franchise board shall have all statutory powers of a board of public works respecting cable television franchising or communications which powers are hereby expressly transferred to the cable franchise board and all powers expressly created for the board or city under any Cable Television Franchise Agreement.

SECTION 4. Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", specifically, Section 8½–28(a) be, and the same is hereby amended by deleting the words crosshatched and inserting the words underlined to read as follows:

Sec. 8½–28. Council Action on Recommended Contracts.

(a) Adopt the ordinance subject to the veto of the mayor, in which case the director of the department of public works department of administration will be directed to execute the franchising contract; ten (10) days after the mayor consents to the ordinance the franchising contract holder shall pay an award fee by certified check in the amount of twenty-five thousand dollars ($25,000.00), payable to the city; or

SECTION 5. Chapter 8½ of the "Code of Indianapolis and Marion County, Indiana", specifically, Section 8½–4 be, and the same is hereby amended by deleting the words crosshatched and inserting the words underlined as follows:

Articles III, IV, V, VI and , VII, IX and X of this chapter shall apply to all cable television systems, whether such franchise was granted before or after December 7, 1979, including the nonexclusive franchise entered into on May 9, 1967, by the County Commissioners of Marion County, Indiana, and Metropolitan Cablevision Corporation. Should any operator, asserting cable television franchise rights within the city by reason of agreement enter into other than pursuant to this chapter, request amendment of such agreement, any amendment approved by or on behalf of the council shall expressly require such amended franchise to be subject to this chapter.

In the event of conflicts between this chapter and the provisions of any cable television franchise granted prior to December 7, 1979, each provision of this chapter shall control unless that interpretation is judicially determined to be an unconstitutional impairment of the contract rights of the holder.

SECTION 6. Any cable television franchise now in existence between the City and an operator is subject to and is amended consistent with this ordinance.

SECTION 7. This ordinance shall be in full force and effect from and after July 1, 1981.

The foregoing was passed by the City-County Council this 6th day of July, 1981.

ATTEST:

[Signature]
President

[Signature]
Clerk of the City-County Council

Presented by me to the Mayor this 9th day of July, 1981.

[Signature]
Clerk of the City-County Council

Approved and signed by me this 13 day of July, 1981.

William H. Hudnut
MAYOR

## EXHIBIT C

### Subpart C—Federal-State/Local Regulatory Relationships

#### § 76.30 Scope of application.

The provisions of this subpart shall not apply to any system community unit that constitutes all or part of a cable television system that serves fewer than 1,000 subscribers.

(Secs. 2, 3, 4, 5, 301, 303, 307, 308, 309, 315, 317, 48 Stat. as amended, 1064, 1065, 1066,

1068, 1081, 1082, 1083, 1084, 1085, 1088, 1089; (47 U.S.C. 152, 153, 154, 155, 301, 303, 307, 308, 309, 315, 317))

[42 FR 19346, Apr. 13, 1977, as amended at 43 FR 20235, May 11, 1978]

### § 76.31 Franchise standards.

Franchise fees shall be no more than 3 percent of the franchisee's gross revenues per year from all cable services in the community (including all forms of consideration, such as initial lump sum payments). If the franchise fee is in the range of 3 to 5 percent of such revenues, the fee shall be approved by the Commission if reasonable upon showings: (a) By the franchisee, that it will not interfere with the effectuation of federal regulatory goals in the field of cable television, and (b) by the franchising authority, that it is appropriate in light of the planned local regulatory program. With respect to a system community unit that was franchised or in operation prior to March 31, 1972, the provisions of this paragraph shall not be effective unit the end of the system's current franchise period, or until 15 years from the date of initial grant of the franchise, whichever occurs first.

NOTE.—The following procedures and provisions are recommended for adoption as part of the local franchising process, but are not mandatory: (1) The franchisee's legal, character, financial, technical, and other qualifications and the adequacy and feasibility of its construction arrangements should be approved by the franchising authority as part of a full public proceeding affording due process;

(2) The initial franchise period should not exceed fifteen (15) years; any renewal period should be of reasonable duration, not to exceed fifteen (15) years, such renewal to be granted after a public proceeding affording due process;

(3) The franchise should specify that the franchisee shall accomplish significant construction within one (1) year after receiving Commission certification, and shall thereafter reasonably make cable service available to a substantial percentage of its franchise area each year (such percentage to be determined by the franchising authority);

(4) Where a franchise contains a policy of construction requiring less than complete wiring of the franchise area, such policy should be adopted only after a full public proceeding, which includes specific notice of the consideration of such a policy;

(5) The franchise should: (i) specify that procedures have been adopted by the franchisee and franchisor for the investigation and resolution of all complaints regarding cable television operations; (ii) require that the franchisee maintain a local business office or agent for these purposes; (iii) designate, by title, the office or official of the franchising authority that has primary responsibility for the continuing administration of the franchise and implementation of complaint procedures; and (iv) specify that notice of the procedures for reporting and resolving complaints will be given to each subscriber at the time of initial subscription to the cable system.

[42 FR 52416, Sept. 30, 1977]